And at this time we'll hear John v. Whole Foods. Good morning, your honors, and may it please the court, my name is Greg Blankenship and I represent the plaintiff appellant, Mr. Sean John. By its own terms, the decision below failed to acknowledge that the standard at the pleading stage for determining whether a plaintiff is adequately alleged injury and thus standing is plausibility. And the decision below explicitly rejected the usual rule that a court must draw reasonable inferences in favor of the plaintiff when determining whether a complaint is adequately alleged standing. The question, then, is whether these two legal errors resulted in the erroneous grant of the motion to dismiss, and of course we believe that it did. So we do believe that it led to the erroneous grant of the motion to dismiss. Indeed, plaintiff plausibly alleged that he purchased underweight products from Whole Foods. The Department of Consumer Affairs press release said that Whole Foods routinely overstated the weights, that this was a systematic problem, and in fact that this is the worst case of mislabeling that DCA inspectors had ever seen. Well, there was short weight, but then there was some stakes in the other direction as well, right? Well, Your Honor, the only basis to conclude that there were some weights that were actually overweighted is an anecdotal report from a daily news reporter, and a couple of points on that. First off, that . . . Not from the Department of Consumer Affairs? Well, it's certainly not in the press release where they state that there was some overweighting. In the actual DCA inspection reports, there were seven that were either accurate or slightly underweight out of 563. That's 1.5 percent out of 100. And so if the question is plausibility, anytime there's a 98.5 percent chance that any purchase is underweight . . . That would be, by definition, plausible? It certainly would, Your Honor, and particularly given that Mr. John didn't just make one purchase. He alleged that he shopped at two Whole Foods over the course of the entire time the DCA inspection occurred, and that he made these purchases on multiple occasions. Cheese and chocolate muffins. Right. Chocolate cupcakes, Your Honor, and yes, that's correct. Incorrect. And in fact, Your Honors, we know from the mall declaration, which the defendant submitted in connection with their motion to remand the case, that both cheese and chocolate cupcakes were among the specific products that were tested by the DCA. So there shouldn't be any question that first, the DCA did inspections . . . What are you getting out of this? What do you hope to achieve? With today's appeal, Your Honor, we believe that the court should . . . Oh, with the case, with the appeal, and then with the case? Well, Your Honor, the consumers have been overcharged. This is a classic example of a deceptive practice. Whole Foods puts its thumb on the scale. And this isn't just some isolated instance. Not only did the DCA conduct its investigations both in the fall and the winter, but it found that, again, over 650 instances . . . they tested over 650 products, and that resulted in 98.5 percent of those products being underweight. So consumers paid more than what they bought for. And that's the exact purpose for the New York GBL Section 349, which is to prevent corporations from unfairly deceiving consumers as to the . . . How much? What's the damage? What's the total relating to the overpricing? Well, Your Honor, it varied, of course, based on the weights and the cost of the product. Candidly, most of these are small dollar amounts. They're a dollar or two, maybe five or six dollars for large products. But the New York GBL explicitly . . . Are we in federal court because the total damages could exceed $5 million? We are, Your Honor. It's important, of course, to remember that the New York GBL provides for not just actual damages, but a minimum of $50 per deceptive practice. Now, whether that's per purchase or per consumer, the fact remains that given that there are eight stores . . . Well, is it per purchase or per consumer? Do you know? Well, Your Honor, this is . . . my understanding of this is actually a little bit of an unclear area of law. But I think the terms of the statute itself provide that a person who is injured gets their actual damages or $50, whichever is greater. So arguably, if a person has made multiple purchases, perhaps that would be their total damages aggregated among the various purchases. Has there been any discovery in this case yet? None at all, Your Honor. We were just here on a motion to dismiss. There was an amendment to the complaint because . . . It's a jurisdictional motion. It's a motion based on standing. So matters outside of the complaint could be brought in. I just ask whether there's been any discovery. There was no discovery, Your Honor. The defendant submitted a declaration, the Maul Declaration, in connection with the motion of remand, which we viewed as actually proving that our client purchased the type of exact products that the defendant suggested. Is there a certain point at which . . . I mean, 98% sounds plausible, but is there a certain . . . this was 89%, at least based on the press release, is that correct? Is that what . . . Yes, Your Honor. The 89% figure is that the DCA said that of all the products they tested, 89% were underweighed by an amount that was greater than the amount that the federal regulations allow for variances. Obviously, when you're talking about weighing food products, there might be a smidge under and a smidge over. But here, 89% were actually beyond that amount. Now I would suggest for our unjust enrichment claim that every single purchase would be a GBL claim, given that there's a safe harbor for following federal regulations. Do you agree that if the press . . . well, agree or disagree . . . if the press release had referred to something substantially less than 89%, say under 50%, but that for the purposes of the DCA, that was enough to proceed against Whole Foods, that that might not . . . that I would agree that at some point . . . What's that point? Well, Your Honor, I don't think you can name what a percentage is. We know that under Anderson News, plausibility is less than more likely than not. So more likely than not is 51%. So for the basis of a motion to dismiss, obviously not as the case progresses, it might be . . . it should be somewhere less than 51%. Is it really as cleanly mathematical as that? I would suggest that for the more likely than not . . . well, we know the plausibility is less than more likely than not. More likely than not, to me, sounds like 50%. Now where between 1 and 50% we fall, I wouldn't care to speculate. But here, that's not the hypothetical. We know not only from the press release that 89% weighed more than the federal variance, but we also know from the actual test results that 98.5% of all the products weighed were overweight. And I think the chocolate . . . the details about the chocolate cupcakes bear explanation. The . . . or explication. The DCA weighed 24 packages of chocolate cupcakes and 12 packages of vanilla cupcakes at three different stores. And every single one of those packages, all 36, were underweight by between . . . It gets to be a very funny kind of class action because you've got the purchases of chocolate cupcakes and vanilla cupcakes and cheese, but there may . . . would the class include people who bought banana bread and mixed pickles? Well, Your Honor, we haven't had a chance to conduct discovery. We're here literally just on Mr. John's individual claim. And the question is whether or not he plausibly alleged that over the numerous times he purchased the exact products that were identified by the DCA, they were undercounting. Now, when we . . . I suspect that we're going to find in discovery that it's not just limited to specific products, that it involves Whole Foods' entire practice of the products that it weighs and labels at its stores. And that is going to be a definable universe. Thank you, Mr. Blankenship. We'll hear . . . on rebuttal, we'll hear from Mr. Selinger. Thank you, Your Honor. May it please the Court. David Selinger for Whole Foods. Your Honors, the district court correctly ruled that the plaintiffs pleaded only conclusory allegations, which the court found to be wholly speculative and which fell far short of a plausible claim that this plaintiff, Mr. Blankenship, was supposed to weigh. The district court's conclusion . . . decision dismissing the complaint for failure to plead a non-speculative injury in fact . . . Well, what do you say to your adversary's argument that 90% reaches the non-speculative level? The odds are 90% and he bought more than one. So, if he bought three packages of chocolate cupcakes, then you're down to something like 97% odds that he overpaid for a cupcake. Your Honor, the problem with Mr. John's case is we have no idea whether he purchased a product that was in fact . . . had a label that misstated the weight as being greater than the actual weight of the product. Didn't he allege that? Excuse me? Didn't he allege that, broadly speaking, in the complaint? Your Honor, all he alleges is really that he purchased cupcakes and cheese at two Whole Foods stores once or twice a month for two years. He doesn't identify the type of cheese. He doesn't identify the type of cupcakes. He doesn't provide any evidence . . . Chocolate cupcakes. No, Your Honor. He's repeatedly said chocolate cupcakes, but he's said chocolate cupcakes based on the mole affidavit. The complaint doesn't say chocolate cupcakes. There's no particularity. He's had three different complaints, and to this day, we do not know what kind of cheese product he purchased or what kind of cupcakes or when, really. Does Rule 12 really require him to specify the kind of cheese? Your Honor, the . . . I mean, isn't that what the discovery is for? The difficulty here, and it's consistent with the Amidex case, the difficulty here is that we have no idea whether he purchased a product that was incorrectly weighed. And it's perfectly plausible that he bought a product that weighed exactly what it was supposed to weigh and he got his money's worth. The DCA press release really only identifies two different figures. It says that the DCA tested 80 types of products and found that they were all misweighed. Cheese? No, it doesn't say cheese, Your Honor. It describes a variety of products. I don't think it, in fact, says cheese anywhere. Dairy? It says dairy. And there are numerous different dairy products that are . . . Baked goods? It says baked goods. It says dairy, baked goods, and meats. And there's no specificity in the agency report? There is specificity in the agency report, Your Honor, and our understanding was that the court had ruled that it was not going to take judicial notice. If you look at the notices of violation, they involve highly specific products, actually. So if the notice of violation says Manchego cheese at a Whole Foods store at Columbus Circle, that has no bearing on whether this particular plaintiff bought grated cheese, Parmesan cheese, smoked Gouda cheese, or any kind of cheese at some other store at some other time. He's never identified the particular products that he purchased. He's never given any indication of particular dates of the . . . What it says is that during the glass period, he regularly purchased the prepackaged products, which are described and defined in the complaint. During 2014 and 2015, he purchased prepackaged cheese and cupcakes approximately one or two times per month. But, Your Honor, all we know is that DCA conducted tests of at least 80 types of . . . They conducted tests of 80 types of products, which means they conducted at least 80 tests. But they described numerous different types of products, not all of which are cheese, baked goods, and meats. They describe, in the press release, shrimp. They describe vegetable platters. They describe pecans. They describe a variety of different kinds of products. Certainly none of those are cheese. None of those are necessarily dairy. They do say that we found incidences of a systemic mislabeling of products, and they describe included in their rubric, meats, bakeries, and dairy products, but they don't identify what they are. So, what you're dealing with is Mr. John coming in and saying, I bought cheese, whatever kind of cheese, and I bought cupcakes. And we have no idea how many . . . Why isn't the answer to all this that he should be, as I understand it, this was dismissed with prejudice? Excuse me, your Honor. Was this dismissed with or without prejudice? It was dismissed with prejudice, your Honor. It was dismissed because of a lack of standing? It wasn't dismissed with prejudice because of a lack of standing. The case was dismissed with prejudice. But the finding was there was a lack of standing, was that the rationale for the dismissal? That was the rationale for the dismissal, but not for the dismissal with prejudice, your Honor. With good reason, because if it was dismissed for lack of Absolutely. So why was it dismissed with prejudice? And the court doesn't say, and in the opinion it's clear that the court did not dismiss with prejudice for lack of standing. The court held that it was dismissed for lack of standing. That is what I understand to be the central holding. And the judgment says with prejudice? Excuse me? The judgment says with prejudice? Not with respect to standing. The court then went on, your Honor, and said, in the alternative, for the same reasons that there was a lack of standing, that would necessarily lead me to the conclusion that the case should be dismissed for failure to state a claim. But if there's no standing, the court has no jurisdiction to do that, is that correct? Correct, your Honor. And it was an alternative holding, and the court need not reach the alternative holding. But if this court reaches the alternative holding, which this court is able to do, this court can affirm the decision on any grounds. If this court affirms the decision based on failure to state a claim, the court could this court could uphold the dismissal of the complaint for failure to state a claim. And that is the grounds on which the case was dismissed with prejudice. I would also point out that Judge Engelmeyer's decision dismissing with prejudice also followed Judge Engelmeyer's conclusion that leave to amend would be futile. And if you look in the record below, my opponent never asked for leave to amend. He was given repeated opportunities to amend. Judge . . . If your point is that he didn't specify the kind of cheese he bought, why would granting leave to amend be futile? He could allege what kind of cheese he bought. Your Honor, my only point is that he had three different opportunities, and he told Judge Engelmeyer that he didn't need to amend his complaint. And Judge Engelmeyer tried pretty carefully to elicit from him whether there were any additional facts that spoke to standing that he had not included in his complaint. And he went so far as to say, don't leave it in the locker room. This is your chance. And he said, I don't need leave to amend. And had you argued at that point that you didn't know what kind of cheese it was? We argued at that point that we had no idea, based on his amended complaint, what kind of cheese he had purchased. And to this day, we have no idea what kind of cheese he purchased. And that's . . . those are really the only two numbers that are included that are pertinent in the press release. The 80 tests and the 89 percent failing to comply with the maximum allowable variation and the other data that my opponent has mentioned about the number of different tests came from the notices of violation, which were not within the record. Your Honor, this is a case in which all the press release does is it provides us with a summary of the investigation. And of the facts that it alleges, it only mentions those two things. There's no allegation that Mr. John ever purchased a product that was actually underweighted. That is, there's no allegation that he bought a product that weighed less than the amount that was shown on the label for that product. He doesn't tell us what the particular products were. The press release only says DCA tested packages of 80 different types of prepackaged products and found all the products had packages with mislabeled weights, and 89 percent of the packages tested did not meet the federal standard for the maximum amount that an individual package can vary. What is that federal standard? The federal standard, our Commerce Department rules. Yeah, whatever it is. What is it? How much deviation? My understanding, Your Honor, is that the maximum allowable variance for a food product is 10 percent for a product that's sold by weight. So that would be what it would be. Let me just make sure that I understand on the refusal to amend. The complaint itself in paragraph four says, when it describes products, those products thus far identified by defendant which may be amended as plaintiffs learn more about the extent of Whole Foods' misconduct. So built into the complaint, there is a request, so to speak, to be able to amend to correct the deficiencies that I think you're trying to identify for us. There is that language in the complaint, Your Honor. And what you're saying is that he waived his or he affirmatively said, I do not want to amend. Well, there are three things. He was affirmatively asked. He said, I do not wish to amend. He made no effort to preserve the issue in the district court. He was then asked at a later hearing whether there was anything else and he said he had no other facts. So Judge Engelmeyer found that the amendment would be futile. And on that basis, he made the dismissal with prejudice, but that was not tied to the dismissal with prejudice. I'm sorry, that was not tied to the dismissal for lack of standing. And Your Honor, we think, we agree that you could not dismiss with prejudice for lack of standing. You could certainly dismiss where there was no basis here to find standing. But if you find on the alternative ground that the case was properly dismissed for failure to state a claim, then you could dismiss with prejudice and the court has the ability, obviously, to rule on that alternative ground. Thank you. We'll hear rebuttal. Thank you. May it please the Court. I'd just like to briefly address the question of the alternative holding. The defendant is trying to put the cart before the horse. One cannot reach the alternative holding that there was no plausible allegation of injury for the reason for failure to state a claim and not also reach the same conclusion on standing. Therefore, if the lower court found that we failed to plausibly allege injury, then it must be without prejudice because the court lacked jurisdiction. You can't reach the alternative holding in the first place. Could you just clear up something for me? You say that your client bought prepackaged cheese and prepackaged chocolate cupcakes, but were they sold by weight? Is it because, you know, you can buy prepackaged cheese, Kraft, you know, will sell you a half a pound or a pound and these little things, American cheese and everything, and the same is true of cupcakes. You can get them, you know, from commercial bakeries that are sold in boxes. Is there an allegation that it was sold, that your client bought cupcakes and cheese that was sold by weight, weighed in the shop, in the store? Yes, Your Honor. When we define the prepackaged foods, those are the foods that Whole Foods weighs and labels in the store, or at least its regional area. And then paragraph 22, we specify that. And I'd also like to point out, Your Honors, that the amended complaint was actually only our second opportunity to amend. Mr. Bassolino, as a plaintiff who's not here before the court, also filed a complaint. But that complaint doesn't just rely upon the press release to determine whether or not the products the plaintiff purchased fell within the D.C. investigation because we also attached the mall declaration to the amended complaint, and the mall declaration specifies that chocolate cupcakes are among those that were purchased. And of course, we know from the D.C.A. inspection that chocolate cupcakes and vanilla cupcakes were amongst those alleged. Now, as I reread the complaint, candidly, it looks like we just said the word cupcakes, but I think it's plausible to infer that if chocolate cupcakes are underweight and vanilla cupcakes are underweight, then cupcakes in general are underweight. It's certainly plausible, given that every single package of cupcakes that were weighed by the D.C.A. were, in fact, overweight. Now, I'd also like to briefly address the Amidex Trading Group, which a defendant refers to and upon which the district court relied. And that case differs from the case at Barr for the same reasons that Wallace v. ConAgra, the case about kosher beef, differs, namely that the plaintiffs there provided no basis for the court to determine whether or not it was actually plausible that they were injured. For example, in Amidex Trading Group, an entity named SWIFT held some unspecified portions of financial transactions, and the plaintiff, which was one of thousands of companies that SWIFT collected information about, provided information. And then some unspecified amount of information from there was provided to the government. And so, if you imagine a Venn diagram with the circles, there was no basis to see where they overlapped. And that's distinct from the case at Barr, where we've demonstrated not only that all of the chocolate and vanilla cupcakes were overweight, but also the numerous times that our plaintiff purchased the products. Oh, it's not all. Well, in terms of the chocolate cupcakes that were weighed, it was, in fact, every single package. The DCA weighed 36 different packages of chocolate and vanilla cupcakes. Every single one of them was overweight between 6 and 32 percent. The 7 out of the 653 packages that the DCA weighed that weren't- I'm saying if it's 6 percent, then it's within the 10 percent that I understood a moment ago is an understandable or allowable deviation under federal standards. That's correct, Your Honor. And, candidly, we didn't try to do the math to parse the percentages to confirm whether or not the inspection results that we received were enough. But again, the amount of overweights reached as high as 32 percent. And these are the records that are attached to our opposition to the motion to strike. The vast majority of those were well over 20 percent. I see that I've gone over my time, unless the Court has any questions. Thank you. Thank you, Your Honors. Thank you both. We'll reserve decision. In the case of the United States v. Sampson, we will take it on submission. That is the last case on calendar. Please adjourn the Court, Mr. Connolly.